Thank you, Judge Watford. May it please the court. I'm Scott Stewart on behalf of the United States. In these cases, if I may, Your Honor, I'd like to say four minutes for rebuttal. In this case, the district court issued two broad preliminary injunctive orders against ISIS response to the COVID-19 pandemic in the Atalanta Detention Center. Specifically, each injunction rests on significant errors and causes significant harm to the United States in the public. This court should vacate each injunction. I'd like to begin Your Honor by addressing the issue of habeas corpus as the vehicle in this case and release as the remedy of the district court order. My hope is then to make sure to cover the merits issues as thoroughly as I can. In addition to answering anything the court would like to ask about. With respect to the vehicle issues, habeas corpus as a vehicle, Your Honor, as we've explained, and this really hits at the release relief that the district court ordered in the first appeal, as well as the bail determination and bail regimes in the second appeal, habeas corpus is not a proper vehicle in this case because this case is a challenge to the conditions of confinement at Atalanta. In that case, a civil rights action, an injunctive action of some sort, is the vehicle that the petitioners would need to pursue. That's supported, Your Honor, by the nature of the appropriate remedy in a conditions of confinement case, which is simply, as this court explained in Crawford, a judicially mandated change in conditions. Counsel, if, I mean, it may well be that on the merits of the Fifth or Eighth Amendment claim that release, you know, that though there isn't a entitlement to release under those claims, but if release is appropriate, you know, if, for example, the only way to improve the nature of the problem is such that the only way to correct the problem in the conditions were to order release. Why isn't habeas the right vehicle to do that? Sure, Your Honor. I mean, two points. One, it is a conditions case. This was distinguished, but more to the point, Your Honor, I have trouble imagining any case in which release would be the only remedy ordered. I mean, even if this court were to think that the conditions at the facility were quite bad, it could order parties, you know, defend it, improve those conditions, do it X and Y, and then if the defendant couldn't do it, the defendant may have to take other measures, may have to do things to comply with the order. But ordering release when the legality of detention is not in question, the ability to detain somebody is not in question, would be inappropriate, Your Honor. And here, for example, the district court order... Brown v. Plata had release, right? So I don't really understand why, if we look at the preliminary injunction, and as you say, it needs to be a conditions claim that's an injunctive release equitable claim. Why can't an injunctive release equitable claim include everything that was involved in the preliminary injunction here? Your Honor, I think there are two responses on Brown v. Plata. It was a different-in-kind case. I mean, as the court knows from our briefing, it was a PLRA case, but even that case... But the PLRA was limiting it. I mean, as its core, what it was, was a conditions case and an equitable release. The PLRA told us some things about the procedures it needed to follow, but the cause of action didn't come from the PLRA. Your Honor, I think the difference, one difference there, and again, I think it's a different context, but a significant difference there is the court acknowledged early in its opinion that release from custody was not necessarily even required under that order. The state of California could have built new facilities to house people in, and that's a similar situation to what you have here, Your Honor. I mean, the district court sort of recognizes that part of the way of complying with the Population Reduction Directive would be to transfer people out, which is simply a recognition that continued confinement is allowed. It's not a challenge to the just ability to generally detain somebody. It really is a conditions challenge. Okay, so why... What in the preliminary injunction was inappropriate as a remedy for an injunctive release conditions claim, which also was brought here? Totally putting aside the habeas, why was this inappropriate as a preliminary injunction in a case about injunctive release for conditions? Because it's still, Your Honor, the appropriate remedy... Brown v. Plata, it's a very different case because the order is there... It came after years of non-compliance, Your Honor. It was not some kind of first measure. And what I'm saying here is that the aspects of the order, to answer your question directly, Your Honor, is the parts ordering release, the specific numbers initially, and then the target population reduction by some period of time. Those would be improper. What the district court should have just done, again, putting aside the ultimate merits that would support any injunctive relief for a moment, Your Honor, is order... You have to change the conditions in ways X, Y, and Z. It can't tell us to, in a conditions case, order release. Again, the PLRA, it has an explicit release provision, Your Honor, which is not what we have outside of... In the civil rights injunctive context. So it really just is a judicially mandated change in conditions. If, ultimately, the government has to take certain steps on release or transfer whatever to comply, that may be a separate question. The government's discretionary discretion in how it complies, but the court can't order release. So that's, I think, the key point there, Your Honor. In a conditions case, it has to be in order to change the conditions. And I think, as to the other pieces, Your Honor, and this gets, of course, to the merits, the other pieces just... The injunction in the first appeal just falls as a whole because of the thoroughness of ICE's response at Adelanto. We've detailed this quite a bit in our briefs, and both the punitiveness challenge and the deliberate indifference challenge fail. With respect to the first one, Your Honor, there are well-recognized government objectives in detention here. Given our response, we have a reasonable relationship between continued detention and those objectives, particularly... So the district court made various fact findings about the conditions in Adelanto, about the staff not wearing masks or not being required to wear masks, inadequate cleaning supplies. Are you arguing that any of those are clearly erroneous? I think we are, Your Honor, to the extent... The district court just did not really... I don't know that the court needs to get to clear error because I think it just simply did not account for the evidence in front of it which showed a broad, system-wide response and kind of a myopic focus on a couple detainee declarations or a few detainee declarations doesn't really address the system-wide response that was shown. I think there was also just a legal error in how the district court analyzed things, Your Honor. The district court was really... The findings were really infected by legal errors about the idea that there had to be six feet of social distancing at all times in all places, that that was the kind of thing needed to satisfy deliberate and different standards, all that sort of thing. So I think it's some of both, Your Honor, but I don't think the court needs to say these were clear errors. I think it can just look at the record of our response under the right legal standards and hold as a matter of law, similar to what the Third Circuit recently did in the Hope decision, Your Honor, about looking at our response and evaluating it that way. But here, the district court... In the Third Circuit, the Third Circuit criticized the district court there for not really engaging with the factual record, not really making doing things ex parte and not really making fact findings. But here we have quite extensive fact findings about unsafe conditions. And if you're not arguing that any of those specific fact findings are clearly erroneous, then I'm not sure how, in this case, you can show that the conditions were safe. I mean, I... What I'm saying, Your Honor, is that our first tier argument are that the district court did not correctly, under the law, account for the presentation we made to the extent that it disregarded... But what did it miss? What did it miss? I mean, it may have found the facts you were saying it didn't believe them, but what did it not account for? I think it didn't account for, Your Honor, the... Let me see if I can highlight any particularly... I mean, I think a lot of these are factual findings dressed up as legal conclusions, Your Honor. I mean, I think the idea that the only effective way to deal with COVID transmission is six feet of social distancing at all times and all places, I think that's definitely a problem. That's not what the CDC guidance recognizes. That's not something that should be attuned to the detention context. I think to the extent... I mean, I think that would be one example. But you're looking at the facts that the district court said. So, I mean, you can argue that the CDC doesn't really require distancing, but in terms of the fact that there wasn't distancing, there weren't masks, there weren't cleaning supplies, there were hundreds of people using the same showers. I mean, is any of that not true? I don't think... I think we disagree on the shower aspect, Your Honor. I mean, our response... It's a little hard to get to, but we do explain, look, I mean, showering, it's being tiered, it's being more carefully administered so that people and everybody can shower and that it's safe. I think the district court just didn't account for measures addressed to promote social distancing overall, just like staggering of beds, staggering of dining hall attendance, those kind of things, to the extent that the district court found otherwise, we would say that those are reversible error. I think the toilet lid situation, Your Honor, is kind of a bizarre one. I mean, that was one where the district court kind of seemed to go and do that on its own in finding the need for integrated toilet lids. We've explained that that's quite problematic. So, again, Your Honor, we've kind of tried to just, as a legal matter, given what the court is facing and just given the thorough responses up against what the district court did and under the relevant standards, we just win as a matter of law. But, I mean, to the extent the court thinks it needs to find clear error to vacate, we're obviously advocating for that. I just don't think the court needs to go kind of fact by fact, especially, Your Honor, as soon as we go into the fine-grained facts of the Adelanto approach, we're really getting into the area where reasonable people can have different views, where it's pretty clear from the declarations on record that Adelanto has responded thoroughly and carefully and tried to address things on a mass scale and has improved over time. It seems like now the population is significantly reduced from what it was at the time the preliminary injunction was entered but then stayed. Yes, Your Honor. So how did that occur? I think it's a mix of things, Your Honor. I mean, I think some are removals from the United States. It's a little hard because it's kind of dynamic, but I think some are removals. I don't have other possibles or things where somebody who is not subject to mandatory detention but could be released as a matter of discretion. I think those are some of the key examples. So is the public at risk right now? I mean, you said at the time, we can't release people. The public would be at risk. So are we at risk right now because of this reduction? Or what explains why you've been able to actually do what the district court wanted you to do? Well, Your Honor, I mean, two things. First, I'll speak to the release piece and then I'll speak to kind of the regulations piece. I mean, the release piece according to the district court, we're still not at a constitutionally appropriate level of detainees because the district court keeps hearing individual bail applications. So we still are injured by the release order. We're being forced to release people who, in our view, we should not have to release under congressional law, executive sound decision making, that kind of thing. As far as the regulations, Your Honor, I mean, this court has stayed them, which is significant, but I mean, some of these regulations, I mean, the toilet lid one, as we've explained, require a lot of releases. Our declarant explains the six feet social distancing at all times, in all places, absent emergency is just not feasible in a facility. There are a lot of burdens on us in operating Adelanto. Adelanto is a really, really important detention center, Your Honor. The district court thought that it was needed for safety to reduce the population by less than, as I understand it, has actually occurred by the government's choice because you haven't had to do that under the state. So the government has chosen to reduce it more than the district court ordered, as I understand it. Is that not true? That's not right, Your Honor. Your Honor, the specific number that the district court almost immediately ordered was 100, then 150 more within seven days. There was then, after that, an undefined further reduction in population level to what the district court viewed as a safe level. As I explained earlier, given the ongoing bail process, it's pretty clear that the district court does not believe that we have reached that level. So we're still being harmed by the release. Isn't the bail process kind of a different issue, though? I mean, the bail process, isn't it looking at individual cases and the risk versus the individual person's situation more than implementing the injunction numbers from before? I don't think... I mean, there are individualized aspects of the bail process, and that's why we're doing it on a class-wide basis, Your Honor. But, I mean, the district court here were attacking the process writ large, which is something that... Again, I mean, the district court, what it was referring to... The key thing that my friends on the other side have sought in this case, Your Honor, are mandatory social distancing achieved partway through release. And the district court ordered that preliminary injunction, then key parts of that were stayed. In the bail process, the district court was pointing back to its previous opinion on the preliminary injunction. So it was referring... The ultimate relief in this case, the ultimate kind of things the district court was pointing to was the alleged need to reduce population for safe purposes, Your Honor. And I think one point I'd emphasize... I see I'm getting close to the four minutes, but just since my friend on the other side has emphasized jurisdiction in the second appeal, Your Honor, I just want to quickly emphasize why this court has approved the second appeal. And the key thing is, under the bail orders, just as it's so under the first preliminary injunction, release is guaranteed for some number of people. And the court does not need to look at the existence of later bail orders to know that. It's just a matter of specifying who and when. The bail orders, as I was just... The individual bail ruling... Sorry. The classified bail rulings that we're contesting on appeal rest on the larger premise of the case that a reduction in population is needed to address conditions and allow for social distancing. So the fact that the district court has ordered them shows that the district court does not believe that we're at an appropriate level. I see I'm at four minutes, Your Honor. I'm sorry, Your Honor. I'm just not sure... I take your point, but I'm not sure why that makes it an appealable order. I mean, what you're saying is that the district court has essentially made clear its view that at some point in the future, it is going to order you to release some people. And surely the orders actually releasing individual people would be appealable. But what I don't see is why this order, which seems to just set up a process for future orders, is itself either a final judgment or an injunction or otherwise something from which you can appeal. Sure, Your Honor. I think the key thing is that a big reason why it operates as an injunction is that although it doesn't order immediate release, as I just explained, it does guarantee future releases because, in this case, the point of release is to get down to a number of supposedly allowing social distancing. I mean, the same was true for the first preliminary injunction, Your Honor, where it didn't order a release this minute, but it said you have to reduce it by this many on this day and then some other number. Here, the district court is just doing them kind of in a seriatim fashion. And it would be a heck of a thing, Your Honor, when you have an indisputably appealable, something captioned or called a preliminary injunction, and then something else that really just gets to the same endpoint, albeit in kind of a piecemeal later specifics to be hashed out fashion, and to not let the government be able to take an appeal to challenge the process writ large. And that's the key point. Why do you say that setting up the process guarantees that they'll be granted? I mean, as I understood it, actually most of them have been denied. What would have prevented the district court from denying them all? Your Honor, most of them have not been denied where the district court has ruled on a merits basis. There was a blanket denial without prejudice for procedural errors earlier, but I think the grant to denial ratio, I believe, I'm doing my best on what I've heard of the numbers, is I think something like eight grants to every one denial or more, something like that. How many grants have there been? Because it didn't seem like a very big number at all, at least at the time of the briefing. I think it's somewhere in the, I want to say 40s or so, Your Honor. I can try to get more specific, but I think it's like 40s you can count on single digits for denies. Some of the delay here, Your Honor, is I think again, the petitioners had a bunch denied without prejudice for not abiding by certain processes, but I mean, the fact is, Your Honor, that Adelanto has done to reduce population as part of its response. The district court has ordered a lot of other releases, and releases were guaranteed when it issued this class-wide bail order, so it is appealable. I see I'm running out of time. I'd be grateful, Your Honor, if I could save a little bit for rebuttal. Don't worry about that. We'll make sure you have time for rebuttal. I want to make sure my colleagues have had a chance to ask all the questions they have. I guess I'd like to hear, I know we issued an argument order, and I guess I'd like to hear your view on whether the particular numbers and dates of releases that were ordered that are now far in the past are still really before us at all. Sure, Your Honor. I think the answer is that as to the specific order to release 100 people within I think four days, and 150 more within seven days, given the significantly decreased numbers, I think those aspects of relief are moot. The release order, the release viability question merits, all that stuff remains live in both of these. Thank you, Your Honor. Hold on. I have a couple of questions for you, but I wanted to see if Joe... Yes, Your Honor. You said that the exact number, population number that would be needed to get down to in order to comply with what the district wanted is still unknown. Is that correct, or do we have a sense as to what the number needs to be? I don't think we yet know that number, Your Honor. I think one open issue that stayed is for example, some of the regulations, and I think the extent of regulation of the facility could affect what the district court believes is a number it can get to, but I don't think we know the exact number, Your Honor, at least on the record of these appeals. Okay. Let me just understand your first out-of-the-box position. You said we as a legal matter are ever reaching any question whether any of the factual findings were clearly erroneous. The core relief that the court granted was this reduction in the population numbers, and as I understand it, that was driven to a large extent by the arrangements in which people have to sleep. It's just not going to be possible to have enough distance between the beds in the way that these particular housing units are set up. So is it your position that regardless of the risk that it might pose to any of the detainees that they can be forced to sleep closer to one another than six feet, and if that's the way the detention facility is set up, that's just too bad for them? No, Your Honor. I mean, I think Your Honor that it's hard to come by a fixed number because it is the detention context. I think what you look at is, I would say, look, to the extent the district court said six feet social distancing is required, period, as a factual matter, that's just, you know, we would say that that's clearly wrong. Again, I think the court can reject that on a legal ground, though, because the reasonable response to kind of address the bedding issue, the situation of where people sleep and that kind of a thing, does show a reasonable response that defeats on the merits and claims here. Well, let me just agree with you in part, because I think you're right that in light of what we know certainly today, maintaining six feet of distance is not necessary 100 percent of the time. It is necessary to have people at least be wearing masks properly if they're going to be closer than six feet for any extended period of time. But my focus was on the sleeping arrangements, because it seems unreasonable to expect detainees to sleep with a mask on for eight hours, you know, a night. And so if the beds are going to be closer than six feet to one another, I think that's what, in my mind, drives the problem from the population numbers, right? And so what I was trying to get a sense from you is I mean, is your position simply that we can house people and force them to sleep closer than six feet to one another, and we're entitled to maintain whatever numbers in terms of the population that we want, regardless of the inability then to separate people in terms of the sleeping arrangement? I I'm not sure that I I think I might have misunderstood part of that question. Could you repeat that one more time? I apologize, Your Honor. I'm prepared to rule against you with respect to the district court's order that the population be reduced down to a level that will allow for six feet of social distancing for people to sleep, at the very least. It seems to me that's the minimum that you, the government, must do in order to ensure that these folks are not exposed to a serious risk of catastrophic injury potentially to them. And so you seem to say that the district court lacked authority even to order that, and I'm just trying to get an understanding of what is your basis for taking that position? Sure, Your Honor. I mean, I think, look, if the court were to agree as a merits matter that the court was entitled to order a change in position, in conditions, I think that's what can be done as an injunctive matter. The habeas peace goes more to release as an available remedy. I think to address the propriety of the bed spacing options, we do dispute the bed spacing findings. We do think that they are adequate. We've explained, I think in our declaration, look, we have distance between the beds. People can sleep head to foot or however the case may be to provide adequate distancing in the circumstances, Your Honor. And I think, again, that's consistent, and I don't think there's a basis here to hold that that is deliberately indifferent or unconstitutionally punitive. Those are very high standards, and I just don't think that a per se answer on bed spacing can defeat that here, Your Honor. I'm just recalling the declarations we have from the plaintiff's side in which they say that actually the way the beds are configured is not adequate, and just from a mathematical standpoint, there are not You cannot maintain six feet of distance in the way at least back in April the beds were configured. I think you would be hard pressed to get us to rule that those factual findings were clearly wrong. Well, I mean, I think the beds aren't all full at Adelanto, Your Honor. I mean, that's one thing. And again, Your Honor, I think it's a mistake to say that the six feet social distancing requirement is a constitutional, that there is a six feet social distancing requirement. That's not what the CDC said. The Third Circuit in Hope just a couple weeks ago said it was error to erect a six feet social distancing requirement to a constitutional standard. Again, we've promoted social distancing. We've tried to address it with the bed issue. There are some realities in the detention context that we do try to do need to account for, though, Your Honor. And I think our declarations, this is at pages, I think, 54 and 55 in the record of our excerpts of record in our opening appeal, try to explain how we've addressed some of these issues at the facility, Your Honor. So we would disagree that the bed spacing is inadequate. We think it is, you know, surely satisfies the legal standard. And it just, in a facility that's so under its capacity where so many social distancing strategies have been used, Your Honor, it would be inappropriate to find a deliberate indifference ruling to be proper here or a punitive ruling to be proper. When you say that, are you talking about the time that the district court entered the preliminary injunction? Both, Your Honor. Both. I mean, at the time of both records on appeal. I mean, by the time of the second appeal the population had, of course, gone down further. Our declarations gave a little bit more detail and color as to what we've done on social distancing strategies and the like. But at the time of the first injunction, we'd taken measures that satisfied our obligations. Again, you know, six feet social distancing as a requirement is just not feasible as a general matter in the detention context. But we've done what's reasonable in the circumstances. And again, I think the CDC's guidance and our coordination and compliance on key points there bear that out. Okay. Thank you, Counsel. We'll ensure that you have some time for rebuttal. I appreciate it, Your Honor. Thank you. Thank you, Your Honor. Thank you, Your Honor. I don't see myself on the screen. Do you all see me on the screen? Yes. Okay, great. Terrific. Thank you, Your Honor. May it please the Court, Samir Dehghassan for Appalese. I'd like to start with this thoroughness of the response point that we heard a lot about from the government because they sort of repeat this a lot throughout their briefs, but I think when you drill down to what the actual response was, you sort of find it was highly inadequate and also most of the time what they're asserting are just things that are, you know, that conflict with specific factual findings the District Court found. So, for example, we just heard from Mr. Stewart that the staggering of the beds was adequate. We have on ER 21 specific findings about, you know, the distance between the beds and that they're all less than six feet. And you have these, they're all bunk beds. You have four-person cells and you have four people essentially all within six feet. There's no dispute in the record even that that is the arrangement that was happening at the time of the preliminary injunction. You know, they mentioned staggering the dinner times. You know, on ER 20 the District Court found that people were still lining up inches apart and that the number of people who were in the dining hall was still more than twice as many as could accomplish social distancing. So, in all of these instances, you know, they discuss how the sanitation protocols were improved. At ER 19 the District Court makes voluminous findings about how the sanitation protocols involved, you know, cleaning the facility with a mop of a dirty mop and a dirty bucket of water that detainees were having to use shampoo to clean their toilets. These are factual findings the District Court made and they're not really seriously being disputed on appeal. And in their briefs they say the quarantine and screening process was adequate. The District Court specifically found that the screening was inadequate and also the guards that over 600 people were filtering in and out of the facility were not wearing masks, were not maintaining social distance and were not being adequately screened. They were just being essentially asked you know, what's your temperature today and do you travel to New York? That was essentially the screening that was happening at the time of the District Court's order. So, the District Court here found essentially, you know, very shocking facts. And all of this in the context, by the way, of a facility that added 500 people to the population within, you know, six weeks of a statewide lockdown order. So, you know, it was an extraordinary case at the moment when the District Court entered this preliminary injunction. And I don't think we really heard anything from the government that changes that. I do want to note this question of the releases and the changing of the circumstances because I think that the implication from the drop in population might be that the government has sort of voluntarily reduced the population of the facility and that's not true. So, there have only been four discretionary releases that the government has made this entire time. They state in their brief that there have been 85 releases. That is just a factual misrepresentation. And, you know, 58 of those releases were court-ordered releases pursuant to TROs and PIs where the government had no discretion. Another 14 were Fryhart releases, which was a class action which puts tremendous pressure on the government to release individuals. And then another 10 were people who were removed. So, there were only four out of 85. So, that is just a factual misrepresentation. And we point that out in our brief. So, were the others transferred? I mean, somehow it seems like the population is like half of what it was. So, the population has dropped because fewer people are coming into the facility. There are some people being transferred out of the facility. There are also people being transferred into the facility. So, we pointed out over 100 people who are COVID from facilities that have had outbreaks were transferred in. There has been no systematic effort to bring down the population. It has been happening because fewer people are coming into the facility. And we don't know the reason for that, but we strongly suspect the reason is that at a facility like Atalanto, you know, you get a bunch of people coming in from street-level enforcement. Street-level enforcement still seems to be continuing. We have a lot of examples of that. And you have a bunch of people coming in who are essentially presenting at the border with asylum claims. And then they get transferred to Atalanto during the sort of pendency of their hearings. And asylum claims have basically been shut down during the pandemic. The CDC has issued guidance saying that if you presented the border with an asylum plan, we're just basically not going to let you in. So, detention across the board is falling partly because there are just so few asylum claims now. Now, we don't know how long that's going to last. That order sort of is repeating every 30 it's going to be reassessed every 30 days. But there's every chance the population of the facility will start to go up again. What there isn't is any indication that the government has been deliberately trying to bring down the population of this facility. And I think we heard Mrs. Stewart state again that there's be no real, they don't believe that's necessary. They believe it's completely fine to have a highly populated facility. And in fact, that courts shouldn't really be addressing this sort of thing at all. The only thing they need to be doing is addressing whether the government has done something in response. And I think that that's sort of I think the fundamental paradigm we have here, which I think goes to this court's mootness question that you asked us to brief, which is, you know, I think it's right to say that the injunction is highly necessary in light of that. The core of the district court's injunction was that the population needs to come down to a level where six foot social distancing is possible. Even if the government had voluntarily accomplished that, I think it would still not be moot because, you know, you're in a classic voluntary cessation situation where it has to be unmistakably clear, as the Supreme Court said in Laidlaw, that the challenged conduct won't reoccur. But here we don't even have that. We have a cessation that's due not to the government's conduct, but to sort of other factors. And so it's sort of the need for the injunction is still absolutely clear. I think the one thing that the district court probably should reassess on remand is whether or not the 150 releases are necessary. I think that's a question that the district court made based on the population level that it had at the time. There's no reason why next week the government necessarily needs to reduce the population by 150. Maybe it does, but that's a question I think the district court has to address in the first instance. So in terms of the disposition, I think it would be to sort of affirm the core relief and to affirm that the district court did not abuse its discretion in entering a preliminary injunction based on the facts before it, but then to vacate the portion of the injunction that calls for the 150 releases and send that back to the district court to take a second look based on present facts. And I think that's probably quite similar to what Mr. Stewart suggested. Council, could I ask you to address, I think by my count there are four decisions from other courts of appeals either reversing or granting stays of injunctions requiring either population reductions or other changes in detention facility administration in response to COVID. Do those courts get the legal standard wrong or do you think that your facts are better in some way than what was going on in those cases? We think our facts are better than all those cases and dramatically better or worse depending on how you think about it. For example in the Seventh Circuit case in the Cook County prison facility, the prison had released 1,200 individuals on electronic monitoring and it had opened up three whole new wings of the facility. So it was making pretty dramatic changes. In the junior case in the Eleventh Circuit, there would be 900 releases, that was the case in the Miami prison facility. So prisons across the country are making dramatic changes at depopulating their facilities, which is something that ICE is not doing anywhere and it is specifically really refrained from doing so. In Adelanto, as you can see, it's opposed every single bail application including, in our case, a 73-year-old man. In the Mesa Verde case before Judge Chabria, it opposed the bail application for a 78-year-old man and Judge Chabria described that as downright irrational not to mention inhumane. So there has been sort of a systemic release of just something we're not going to do within the ICE system. The facts at Adelanto are specifically quite a bit worse and we have detailed factual findings. As Judge Friedland said, one of the things that the evidence doesn't have any real findings on the sort of space component. Here we have those precise findings and none of the other cases really have this level of detail and I think that the response in terms of what ICE did here is just far less than anywhere else. I also should note that in the Sixth Circuit, where the response was probably still better than it was here, that was a prison case and the court said the objective deliberate indifference prong is easily satisfied on those facts. It was the subjective deliberate indifference prong which doesn't apply in civil cases like this one that was the basis of the Sixth Circuit's ruling. So we think the Sixth Circuit basically completely aligns with what the court would be doing here in affirming the injunction. As I understand the test, I'd be interested if you see it the same way the test is whether the government's action is excessive in relation to its non-punitive purpose, but the cases articulating that test it's a test that governs the treatment of detainees so the fact that the person is going to be detained seems to be assumed what is and yet you want to say well detention itself here the detention itself is the problem because it creates the crowding that creates the risk and so what is the legal basis by which we can say well we're going to not assume the fact of detention but we're going to look at whether the government has some legitimate non-punitive purpose in detaining at all because I don't see that that's a thing that's been done in prior Fifth Amendment cases. We're not suggesting that your honor. I mean the core of the relief here is that people need to be detained in situations where they can exercise reasonable safety where they can exercise six foot social distancing and so if the government could accomplish that by moving people to other facilities that would be fine. The district court's order is totally consistent with that and we're not seeking release for everyone in the class. Far from it. We're saying you need to release a sufficient number of people so that everyone can exercise social distancing where that means for the people released that's social distancing at home. For the people still within the facility that's social distancing within the facility. The only thing we're really saying is that if you detain people under conditions where they're at serious risk and the district court found extreme risk of getting COVID-19 that is excessive in relation to the government's legitimate purposes. So we don't contest the legitimacy of the government's purposes. We don't contest that there's a reasonable relationship between detention but it's the excessiveness that's the key and that's what this court's cases and Jones and King sort of say. Excessiveness looks to the sort of conditions that people are housed in and it asks whether that is too much given the government's purpose and given the reasonable alternatives that exist. So here we have the ISAT program which has shown 99% effectiveness and electronic monitoring and other things like that. Is it true that every single person within Adelanto needs to be detained in order to accomplish the government's purposes? And again we think it's very plausible the government could accomplish social distancing within Adelanto without releasing a single person who is subject to mandatory detention or a subject who has even had a serious criminal conviction of any kind because there is evidence in the record that about half of Adelanto is detained without having committed a criminal violation and I don't think anyone disputes that if they'd removed half the people from Adelanto that probably would be enough to accomplish social distancing. So that's the real question is it excessive to keep every single person in Adelanto which is the government's position in relation to the purpose of detention which is to prevent absconding and to prevent crime and again there's no evidence that anyone who's been released on electronic monitoring or on bail from any of the cases across the country that have done so has really committed any crime. So once again I think that's how the doctrine sort of works and if you take the government's kind of extreme position I think it is as soon as we identify a legitimate interest that's the end of the inquiry and that can't be right. I mean Jones and King would have come out differently. There has to be some inquiry about the balancing and the excessiveness and if it's not excessive to put someone in extreme danger of their life then what is excessive? So I don't know what set of facts under the government's theory would ever warrant relief. I think it's basically the government is sort of asking for carte blanche in the context of civil detention and that really brought up this court's precedent. Can I ask you, you seem to suggest a minute ago that you do have in mind a number a population number that would allow for adequate social distancing? So that I think is something that's probably going to be addressed in more detail at the upcoming trial. There's obviously plenty more evidence that we now have and a greater understanding of the physical footprint of Adelanto. I don't think we have a number particularly in mind. I do think probably in the course of the trial the parties will probably propose different numbers. I'm sure Judge Hatter will ask for a number. I think the point that you made Judge Wofford is exactly right. At its core I think that number is going to be very much linked to bed space. I think that if you have these sort of 8 by 12 foot cells it's very hard to have more than one person in those. If you have a 10 by 15 foot cell it's very hard to have more than two people in those. And then these open plan areas the beds are really really packed together. You actually have sometimes six beds within six feet of each other. And so I think part of it is going to be can fit within the footprint of that facility given the sort of sleeping arrangements. The beds are currently bolted down so they can't move the beds. Now maybe the government will say at trial we can move the beds and there will be sort of litigation about that. But I do think that's going to be the key in terms of figuring out the number is can everyone sleep in a way that they're actually at least six feet even three or four feet under the current circumstance it's very hard to do that because of the bunk beds. Okay and so is it your position though that whatever the number is today and I don't know what it is maybe you do know what it is but whatever the number is today it's not low enough yet? We think it probably is not low enough but I'm not 100% certain. It's currently in the mid 800s. We probably think it's not low enough. We know from discovery that there are still three people in four person cells so clearly there is still no social distancing happening at the facility under the current circumstances. Whether it's possible to happen and the government is just sort of not implementing it is a different question. I do think whether or not it falls below at trial we're certainly going to make the argument that even if by the time trial rolls around the number at the facility is lower than the number that we think is acceptable an injunction is going to be necessary to prevent backsliding because as soon as this case ends I think the government is going to be able to make an order and the facility is naturally going to increase in population a lot. I'm certainly with you on the core holding that the district court issued in terms of as I said my focus was mainly on the sleeping arrangements but the district court's injunction was quite intrusive and went quite a bit further than that. There were a number of provisions that I just find highly questionable in terms of whether we could affirm them. For example the order I think as your opponent mentioned that inmates and guards are to maintain six feet of distance basically at all times except for these very narrow exceptional circumstances. That strikes me as not remotely feasible in a detention facility and also not necessary because we know people can get on and off and across the country you just need to have appropriate protective equipment mainly masks. I'd just like to hear you speak to beyond the core issue of the population number. What about all the other components of what seems like a very micro-managing kind of injunctive order? I think it's sort of one has to think back what the context in this case arose in. They were these really dramatic facts. The government was taking a pretty extreme position that it didn't have to do very much of anything and in practice wasn't doing very much. So I think Judge Hatter tried to create very strict and stern lines to just sort of make sure that there'd be immediate compliance. Now again I think a lot of those things to the extent the court thinks they're excessive or unreasonable are things that Judge Hatter could look at again on remand. I do think what's interesting is the government never went to Judge Hatter  and said here are our practical problems, here is why it would be really tough for us including the toilet provision that Mr. Stewart mentions. All of those objections just appeared for the first time in their stay briefing before the 9th Circuit and have then been a big piece of their briefing here on appeal. But they've never gone to Judge Hatter and said we think these provisions were unreasonable. They didn't seek relief from those provisions in the first instance. And I think there's no reason to think Judge Hatter actually wouldn't be amenable to that. He has been in the government's favor. For example in the bail process he really ratcheted up the level of proof from even what the parties agreed on. So he's been very fair to the government there's no reason to think he wouldn't be. And if this court would have vacated some of those provisions and let Judge Hatter look at them in the first instance, or just say to the government go ask Judge Hatter first, I'm sure he would be very amenable to changing them. But as you point out Judge Watford, the core of the injunction is the need to make sure that the population level is such that six foot social distancing is possible. And I think that that is on the factual record the district court had a totally reasonable provision. I think the government is trying to use these marginal provisions to make it seem less reasonable. But at its core, Judge Hatter did something fundamentally he said not only the government has the discretion to decide whether it's releases or deportations or transfers, the government gets to put any conditions it wants on those releases. So it gave maximum discretion to the government to do what it wanted to do in terms of those releases. And intriguingly, in Judge Chabria's case in the Northern District of California, when Judge Chabria asked the government what is the remedy you would want if I were to find a constitutional violation against you, it was basically the same remedy as here. The government said we want something that gives us maximum discretion to decide who to release and the conditions under which they're released. And I think Judge Hatter was trying to emulate that in terms of the core relief here. Could you address Allman v. Barnes, the Orange County case? Because that was, as I read it, a somewhat more modest injunction at a facility that had an active outbreak. And after we didn't stay the injunction, the Supreme Court did. And I know they didn't write an opinion there, but do you think that action from the Supreme Court is a hint that we ought to take? I don't think so, Your Honor. Probably because the criminal context is very different. It's a much higher standard. Probably because each of these cases, I don't think we would dispute, need to be assessed on their facts. And they have to do with the specific factual findings that are issued. Now, there was an outbreak in that case. There hasn't been an outbreak yet here. But as the District Court said, that's purely fortuitous. And you can't wait for the outbreak to happen before putting in place the policies that you need to prevent it. If you look at Mesa Verde, there were no cases of COVID until late July. And then in two weeks, half the facility tested positive with COVID. Because the nature of the asymptomatic transmission means the virus can circulate for 14 days and infect a whole bunch of people before anyone knows it's even there. So whether there's an outbreak or not shouldn't be dispositive. And I think the Supreme Court recognized that, and the District Court recognized that. So what really is important is what are the policies in place? And the policies in place here are really, on this factual record, the worst of the worst. Because Adelanto did essentially nothing from the beginning, aside from increase the population of the facility, from the beginning of the pandemic until Judge Hatter's order. It wasn't even using basic mask protocols. They say that they were giving detainees masks. Judge Hatter said they were giving them insufficient numbers of masks. You have all these detailed sanitation findings. You have the findings about the communal space and people being inches apart. So this is sort of the most extreme and most detailed set of factual findings we have. And it's in the civil detention context where the standards are dramatically lower. We have a whole theory of proof in terms of the excessive conditions doctrine that isn't available in the criminal context. And as the Sixth Circuit said, you know, the objective deliberate indifference prong is a much lower, is often easily satisfied, but the So I don't think that this court should look to the Supreme Court's order as being anything other than a judgment based on the particular facts before it. And eventually, I think a lot of these cases are going to come up and the court's going to have to make case-by-case assessments based on the particular facts. And I do want to make one sort of final point about the six-foot requirement. Because, you know, Mr. Stewart sort of described that as the court finding that was the constitutional minimum. That is not what the court found. The court found that there was a violation of the constitution based on the totality of the circumstances. And then on the remedy side, he said, you need to implement six-foot social distancing. I don't think that means that in every facility in the country there needs to be six-foot social distancing. I think if, for example, a facility could prove it had unbelievably good quarantine policies that prevented the virus getting into the facility it might well be able to say, we need a little bit less distancing here because we have such good quarantine policies. But here, we didn't see anything like that. We saw bad quarantine policies. We saw no mask wearing. We saw intransigence across the board. And so Judge Hatter said, under the circumstances of this case, we need a six-foot distancing requirement to make sure that, you know, the government needs a stringent line, a strict line, to make sure the government complies. I don't think that this court, if it affirmed the district court, would be doing anything other than saying, on a fact-specific analysis of this case, that the preliminary injunction was not an abuse of discretion. It would be a pretty narrow holding. Could I ask a question? So, it seems like the response to the Nettles argument is that actually here you are asking for release, so that is within habeas. And as I understand it, the bail orders stem from habeas. So what I'm wondering is, for the bail orders, should there be a subclass of those detainees who don't have mandatory detention? The government made this argument that class certification was inappropriate because some people have mandatory detention and some people don't. And it seems to me they may have a point as to the bail orders and that habeas relief. And I wonder if you could speak to that. I mean, the way the bail orders are working is that there's sort of an individualized inquiry about the circumstances of that case, which is taking into account, you know, their criminal history in a very significant way, and also their, you know, their rehabilitation, various other factors where they would stay outside. And obviously, I think if someone was in mandatory detention, that would be a significant factor the district court would consider. I don't think it means that the district court can't consider bail for that person, because ultimately the question is, is there a constitutional violation as to that person in their individual circumstances? And the fact that there's a statute that says they have to be detained doesn't mean the court lacks authority to release them. So if you were to have someone who was extremely vulnerable, for example, and, you know, was being housed in conditions where it was very likely he specifically was going to get COVID-19, I think it would make sense for the court to consider the fact that he's under mandatory detention, but for it not to be dispositive. So I don't think there needs to be a subclass, because it's just one of the factors that goes into each individual bail determination. Usually there have been subclasses in some of the cases in the other circuits, though. I mean, maybe you should have a subclass of people who aren't subject to mandatory detention and a subclass of especially vulnerable or old people or whatever. But I guess I'm just not totally sure that for the bail, I understand why the entire class that made sense for the injunctive relief claim is exactly the same for habeas, why everyone is in a similar position as in the habeas one-by-one bail determination. I mean, the entire class is certified because, you know, I think under this court's decision in Parsons, this is the sort of class that you have where, you know, it's a subject to one systemic violation. That works for the preliminary injunction and the equitable relief, but when we get to the individualized bail, which is how we're ending up dealing with the habeas, it's less like Parsons, right? I guess that's true, Your Honor, and part of the issue with the bail applications and the bail process is, you know, it arises out of the government's position, which is that no individual class member can file their own habeas petition. That's what the government said, and that's what the District Court's class certification order said, and so if it wasn't for the bail process, you know, the doors of Adelanto would basically be locked until the end of trial. And so what the bail process is essentially a way for individuals who are within the class, which has already been certified for systemic relief, to sort of get their circumstance in front of Judge Hatter and say, I know you're going to rule on final injunctive relief in October, November, but at the moment there's no way I can get out. I need to have my individual circumstance adjudicated because I could die before then. And so that's what bail really is in substance, and, you know, I think that one option would be just for Judge Hatter to allow individuals to just present their own individual habeas petitions. I think Judge Hatter wanted a systematic, more organized process, and I think the government probably wants that too. I don't think the government wants 1,800 bail applications. So that's sort of what the bail process looks like. I mean, the way in which they're currently being done is that people who are in the FRIHAT class, which is the group of people who have ICED identified as being high risk, the bail order requires that they be presented to the court first, and we're still working through that class of highly vulnerable people, and there's no way we'll be able to get through that listing of people before trial. So in practice, the only people who are really going to be presented for bail applications are people who are already within a highly vulnerable subclass. Does that answer your question, Your Honor? I think so. I mean, maybe that also means that if we said there should be a subclass, it won't hurt you. I mean, maybe it doesn't make a difference either way. I think that's right, Your Honor. I don't think we have, we have no principled objection to breaking this into subclasses. It wasn't the way we've litigated this case, partly because we weren't seeking that, you know, the subclass cases are typically ones where the petitioners are saying, everyone in this vulnerable subclass needs to get out. They're all vulnerable. They specifically need to get out. That's never been the nature of our claim. Our claim is that you need to give everyone in the facility, because COVID is dangerous to everyone, six foot of social distance. You don't have to let anyone out, but you've got to make sure that everyone has six feet of social distance. So it's structurally a quite different type of claim to a lot of the others, and that's why it wasn't litigated with subclasses. We certainly have no objection if the court thinks that would be more appropriate. That's something else the district court could consider on remand. Okay. Thank you very much, counsel. Thank you, Your Honor. Let's put four minutes on the clock for counsel for the government. Thank you, Your Honor. I want to make sure to make at least two points. One with respect to the beds, which is, of course, gotten a lot of attention, and another with respect to just the approach that ICE has taken in response to the pandemic here. With respect to beds, Your Honor, we would argue that there is both a clear error factually, but also just an overarching error legally. On ER 54 and ER 55 of the first appeal, Mr. Valdez sets forth the spacing between beds. He describes in the West facility 5'4 inches of space between beds, 6'10 inches between beds in the East facility. With respect to the former, even though there's less than six feet, he explains head to foot sleeping would allow six feet in those circumstances. Wasn't the problem the measurements were from like the middle of the bed to the middle of the bed or something? It wasn't edge to edge? I thought that's what the district court ended up finding. Those are the ones I'm emphasizing, Your Honor, the edge to edge one. He also gives the center to center ones. So, again, what I emphasize, and this is really, I think, the critical point, Your Honor, is that this court could even agree factually on the bed thing, but still say, look, you can't say as a class-wide, systemic, system-wide matter that this is deliberate indifference warranting a class-wide preliminary injunction. The district court definitely got that wrong. I'd emphasize, Your Honor, just on the merits overall here, a key and fundamental point is that the main things that my friends on the other side are focusing on are the need for releases and the need for social distancing, or the need for reduction of population and the need for social distancing. The declarations here show that that's what ICE has done for months and months. We've implemented a lot of social distancing strategy, dining, bedding. We've used PPE in addition. There's no need on the six feet social distancing thing is not a requirement. It needs to be adapted to the circumstances. Nonetheless, we've taken sound social distancing strategy. My friend also says, essentially, that ICE has done no response. That's just not viable on this record. We've reduced the population by hundreds of people. We've explained in our brief that the factual misrepresentation, that's just not so. Particularly, he himself admitted that a number of those were releases under FRIHOP, which does not command release. I'd also emphasize, Your Honor, that when this court is looking at the record, I would encourage the court to look closely at our declarations as I know the court will do. But a recurring problem in the petitioner's briefing here is two things. One, they rely repeatedly on evidence for their key arguments that post-states the orders that are on appeal here. That's not appropriate. There are a lot of mischaracterizations in that regard. It's a big problem. The other thing is they just don't account for the evidence that we show. Rhetorically, they're very sweeping, but our response here has been careful, thorough, and responsive. They fault us also, Your Honor, for not seeking modifications from the district court. We tried to get a stay from the district judge from both injunctions here. He would not give us a 24-hour stay from the immediate release order. We had to go to this court. We got that stay. Despite getting that stay from this court, we've reduced the population at Adelanto by hundreds and have continued to promote in-institute social distancing strategies. That's the opposite of deliberate indifference. That's the opposite of punishment under the Due Process Clause. We have taken the measures that the law commands. I would just emphasize in closing, Your Honor, as the Third Circuit of Hope recognized last week, this is a challenging context. You need to evaluate, as Your Honor knows, the nature of the challenge. You need to evaluate ICE's responsibilities, the need to adapt things to the detention context. Here, ICE at Adelanto has done those things. It has continuing responsibilities, and yet it has adapted with social distancing, with population reductions, and it has not been deliberate indifference or engaged in unconstitutional punishment. Thank you, Your Honor. The case just argued is submitted, and we are adjourned for today.
judges: Watford, Friedland, Miller